UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                          Plaintiff,<br>v.<br>ISIDRO LOPEZ-ROCHA,<br>                                          Defendant. | Case No.: 17-CR-4104-BTM<br><br>**ORDER DENYING MOTION TO DISMISS AND REQUEST FOR REMEDIAL MEASURE**<br><br>**ECF NO. 33** |

Defendant Isidro Lopez-Rocha has filed a motion to dismiss the Government's Information or, alternatively, for the Court to take remedial measures for the destruction of a video recording at a checkpoint. (ECF No. 33). For the reasons discussed below, the Court denies Defendant's motion to dismiss the Information and Defendant's request for an alternative remedial measure.

**I.    BACKGROUND**

On October 24, 2017, Defendant drove a vehicle to the United States Border Patrol Checkpoint on Highway 86 near Westmorland, California. At the checkpoint, Defendant remained in his car while an agent conducted a primary canine inspection with a drug detection dog. The dog alerted to Defendant's vehicle, which was then sent to the secondary inspection area.

1

At the secondary inspection area, a border patrol agent asked Defendant for consent to search his vehicle. Defendant responded "yes." During the second canine inspection, after Defendant had exited his vehicle, the dog again alerted to Defendant's vehicle. Upon further inspection, which involved removing the bed of the pickup truck, agents eventually found packages of methamphetamine floating in the vehicle's gas tank. Upon speaking with a DEA special agent, Defendant admitted that he was paid to cross the vehicle into the United States and understood that he was transporting narcotics.

Defendant was arrested on October 24, 2017, with his initial appearance on October 25, 2017. (ECF No.1). On December 5, 2017, the Government filed the Information against Defendant, charging him with one count of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). (ECF No. 12). On January 23, 2018, Defendant sent the Government a discovery request letter. (ECF No. 38). On February 2, 2018, the Court ordered the Government, pending final judgment, to preserve evidence, including any video footage of the vehicle's approach and detention at the checkpoint. (ECF No. 24). On February 9, 2018, Defendant moved for discovery relating to the Highway 86 checkpoint video. (ECF No. 25). The Government responded that the checkpoint video was no longer available and had likely been overwritten in December, approximately 45 days after Defendant's arrest. (ECF No. 27). According to Border Patrol Agent Marc Lieberman, Customs and Border Protection policy provide for a minimum thirty-day retention period for video from the Highway 86 Checkpoint. (ECF No. 30). The amount of time that video is retained depends on the system's storage capacity because video recordings are set up to record until the memory is full, at which point the video begins to record over the oldest recorded video data. *Id.* Typically, this re-recoding occurs every 4-6 weeks. *Id.* Video cannot be preserved unless manually downloaded before the desired footage is recorded over. *Id.*

Defendant now moves to dismiss the Information, asserting a violation of due process for the destruction of the video recording at the checkpoint. Alternatively, Defendant asks the Court to take alternative remedial measures by drawing an adverse inference that the video would not have supported the Government's view of any contested events at the checkpoint. (ECF No. 33).

## II. DISCUSSION

### A. Motion to Dismiss the Information

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. [The Supreme Court has] long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Consequently, when the Government "suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (citing *Brady v. Maryland*, 373 U.S. 83, 83 (1963)).

However, "the Due Process Clause requires a different result when [dealing] with the failure of the [Government] to preserve evidentiary material [that] might have exonerated the defendant." *Fisher*, 540 U.S. at 547. "[T]he reason for the difference in treatment is . . . that whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988) (internal citation and quotations omitted). Further, there is an "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58 (internal citation omitted).

Therefore, in the context of the Government's failure to preserve evidence, "the government violates the defendant's right to due process if the unavailable evidence possessed exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (citing *Trombetta*, 467 U.S. at 489). "[U]nless a criminal defendant can show bad faith on the part of the [Government], failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.

### i. Exculpatory Value of Destroyed Evidence

"Potentially useful evidence" is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) (citing *Youngblood*, 488 U.S. at 57).

Defendant argues that the video recording would have been crucial evidence for his motion to suppress on the basis that the canine alert at the checkpoint did not provide probable cause for the extended detention of Defendant and the search of the truck. "At fixed Border Patrol checkpoints within the nation's interior, the government can send a motorist for a brief secondary inspection upon a minimal showing of suspicion, but then (as is the case with an ordinary traffic stop) it needs probable cause or consent in order to search the vehicle." *United States v. Thomas*, 726 F.3d 1086, 1095 (9th Cir. 2013) (internal quotation omitted). "[A]n alert by a reliable drug-detection dog establishes probable cause." *Id.* at 1096. "A defendant, however, must have an opportunity to challenge . . . evidence of a dog's reliability." *Fla. v. Harris*, 568 U.S. 237, 247 (2013). "And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* For example, "it is

conceivable that by directing [a] drug dog to touch [a] truck and toolbox in order to gather sensory information about what was inside, [a] border patrol agent committed an unconstitutional trespass or physical intrusion." *Thomas*, 726 F.3d at 1093. Courts have suppressed evidence derived from unconstitutional searches using drug detection dogs. *See, e.g.*, *United States v. Summers*, 153 F. Supp. 3d 1261, 1269-70 (S.D. Cal. 2015) (suppressing all evidence derived from a search of a vehicle where probable cause was solely determined by a canine alert that defendant's expert testified was no more than interest behavior, based on recorded video of the checkpoint inspection).

The Ninth Circuit, however, in *United States v. Barton*, rejected the characterization of evidence related to a motion to suppress as exculpatory. There, the defendant, relying on the *Trombetta* and *Youngblood* framework for the Government's failure to preserve evidence, argued that destroyed "marijuana evidence was exculpatory because its introduction into evidence at the suppression hearing would have impeached the allegations relied upon by the Government to show probable cause, and would have resulted in the exclusion of incriminating evidence against him." *United States v. Barton*, 995 F.2d 931, 934 (9th Cir. 1993). The Ninth Circuit found the argument to be "without merit" because while "resolution of a suppression motion can and often does determine the outcome of the case, the successful suppression of incriminating evidence is unrelated to the actual culpability of an accused." *Id.* (internal citation omitted).

The Ninth Circuit nonetheless decided to expand the applicability of the *Youngblood* framework to "the destruction of evidence which is necessary to impeach material allegations in an affidavit for a search warrant." *Id.* at 935. The Ninth Circuit explained that "[b]y deliberately destroying impeaching evidence, an officer could feel secure that false allegations in his or her affidavit for a search warrant could not be challenged. Such a result would effectively deprive a criminal defendant of his Fourth Amendment right to challenge the validity of a search

warrant." *Id.* Therefore, "the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant." *Id. See also United States v. Monzulla*, 195 F. App'x 629, 631 (9th Cir. 2006) (recognizing that *Barton* applied *Youngblood* to suppression hearings).

Here, there is no challenge to the truthfulness of allegations in an affidavit for a search warrant, as border patrol agents did not need to obtain a warrant to search Defendant's car, as long as there was probable cause. *See Carroll v. United States*, 267 U.S. 132, 153 (1925). However, this "probable-cause determination must [have been] based on objective facts that could [have] justif[ied] the issuance of a warrant by a magistrate." *United States v. Ross*, 456 U.S. 798, 808 (1982). Because Defendant intends to challenge, through a suppression hearing, the factual basis of the probable cause determination from the canine inspection, the Court finds the rationale in *Barton* to be sufficiently analogous to bring the checkpoint video, despite its value not being exculpatory in the strict sense, under the *Youngblood* framework.

The Court further finds that the destroyed checkpoint video was "potentially useful evidence" because, "it could have been subjected to tests, the results of which might have exonerated the defendant."[1] *See Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015). Because Defendant is charged with one count of possession of methamphetamine with intent to distribute, had the video shown that the behavior of the dog did not create probable cause to search Defendant's vehicle, the evidence of the packages of methamphetamine, the only incriminating evidence besides the confession, could be suppressed. *See United States v.*

---

[1] The Court will address the question of whether any exculpatory value of the checkpoint video was apparent before it was destroyed in conjunction with its bad faith discussion, as the two issues dovetail and "turn on whether any exculpatory value of evidence . . . was apparent to the government agents." *See United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013).

*Niebla-Torres*, 847 F.3d 1049, 1054 (9th Cir. 2017) ("The corpus delicti doctrine requires that a conviction must rest on more than a defendant's uncorroborated confession.").

### ii. Ability to Obtain Comparable Evidence

The destroyed evidence must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Cooper*, 983 F.2d at 931. Even without the checkpoint video, Defendant would be able to challenge the drug detection dog's reliability through discovery of the dog's training and performance history. *See Harris*, 568 U.S. at 247. However, "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause." *Id.* at 1057-58. Here, Defendant asserts that from where he was sitting in his truck during the first canine inspection, he could not see what the dog was doing.[2] Therefore, he would not be able to testify about the circumstances surrounding the dog's alert. Any testimony about what happened at the checkpoint will almost certainly come from the Government's witnesses. Consequently, for the purposes of challenging the Government's witnesses, Defendant does not have the ability to obtain evidence comparable to the destroyed checkpoint video. *See Cooper*, 983 F.2d 928, 932 (finding the comparable evidence prong to be satisfied because defendants had "no comparable, alternative means of defending themselves against testimony by government witnesses about" the physical properties of destroyed laboratory equipment).

### iii. Bad Faith

The "bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction. The

---

[2] Defendant exited the vehicle during the second canine inspection but it is unclear whether or not Defendant observed any of the border agent's or dog's actions during the search.

presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Cooper*, 983 F.2d at 931. "[W]ithout knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith*." Zaragoza-Moreira*, 780 F.3d at 977. Therefore, "[b]ad faith requires more than mere negligence or recklessness." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).

The Court has already detailed the potential exculpatory value of the checkpoint video: the video captured the circumstances surrounding the canine inspection, which could have shown that the dog's behavior did not create probable cause to search Defendant's vehicle, potentially resulting in the suppression of the methamphetamine found in the vehicle, the basis for the current charge against Defendant. The question now turns on whether this exculpatory value was apparent to the Government at the time the checkpoint video was overwritten.

In *Zaragoza-Moreira*, video footage from the San Ysidro, California Port of Entry was destroyed when it was automatically recorded over within 30 to 45 days of defendant's arrest for importing narcotics into the United States. *Zaragoza-Moreira*, 780 F.3d at 976-77. While not "materially exculpatory," the Court found that the video was "potentially useful evidence" for defendant's duress defense, namely the third element of the defense where it would be relevant whether defendant had an opportunity to surrender to authorities on reaching a point of safety. *Id.* at 978. The Court explained that the video may have shown defendant engaging in behavior, like loosening packages of drugs from her body, to make herself obvious to law enforcement and attract their attention. *Id.* The exculpatory value of the video was apparent to the Government because during an hour-long interview following arrest, defendant repeatedly told the agent about engaging in behavior that would attract attention from law enforcement. *Id.* at 979. Further, the Court found that the agent "obviously recognized the importance of [defendant's]

statement that [the person she was claiming she was under duress from] was with her in the pedestrian line" as the agent repeatedly asked and confirmed defendant's answer about it. *Id.* The agent also "admitted that she understood that a defendant who is threatened or forced to commit a crime has a possible defense to that crime [and] she knew the pedestrian line at the Port of Entry was under constant video surveillance and that she had the ability to review and preserve the video recordings." *Id.* at 980. Further, in three of four reports that the agent authored in connection with the case, as well as in the probable cause statement supporting the criminal complaint that was presented to the magistrate judge, the agent omitted any references to defendant's claims of duress. *Id.* Together, the Court found that the agent "made a conscious effort to suppress exculpatory evidence, thereby acting in bad faith." *Id.*

Similarly, in *Cooper*, the Ninth Circuit found that the Government acted in bad faith when it failed to prevent laboratory equipment from being shipped to a toxic waste dump, where the potential exculpatory value of the equipment was apparent to agents. *Cooper*, 983 F.2d at 931. There, defendants operated a chemical laboratory that they maintained was used to manufacture dextran sulfate, a treatment for AIDS. *Id.* at 930. DEA agents searched the lab and concluded it was an operational methamphetamine lab. *Id.* Defendants were charged with conspiracy to manufacture methamphetamine and maintaining a place to manufacture methamphetamine. *Id.* Laboratory equipment was seized and given to a waste disposal company, where the seized items would be stored for a short period of time unless the government requested that items be held as evidence. *Id.* No one told the waste disposal company to preserve the equipment for evidence or inspection and it was shipped to a toxic waste dump. *Id.* The Court explained that the laboratory equipment's "value as potentially exculpatory evidence was repeatedly suggested to government agents" because in conversation with defendants, "agents repeatedly confronted claims that the

equipment was specially configured for legitimate chemical processes and was structurally incapable of methamphetamine manufacture." *Id.* at 931. Further, when the defense contacted one of the government agents, reiterating defendants' claims of the legitimate purpose of the laboratory and demanding the return of the seized equipment, "[e]ven though he knew the equipment would be destroyed, [the agent] responded that it was being held as evidence." *Id.* at 930.

Here, the Court does not have evidence before it that indicates that the potential exculpatory value of the checkpoint video was apparent to government agents and that the agents allowed the video to be overwritten in bad faith. Unlike in *Zaragoza-Moreira* and *Cooper*, where government agents were repeatedly and explicitly made aware of defendants' claims and what the destroyed evidence might have shown, here, the Government was not put on comparable notice. No facts indicate that, prior to the video being overwritten, anyone called into question the circumstances surrounding the checkpoint inspection and Defendant's arrest, such that government agents should have known to inspect and preserve the checkpoint video. Further, even in the absence of probable cause, a vehicle may still be searched pursuant to consent. *Thomas*, 726 F.3d at 1095. Therefore, even assuming that government agents should have known about the legal significance of video footage of a canine inspection potentially undermining the basis for probable cause in a suppression hearing, because Defendant purportedly gave his consent for the vehicle search during secondary inspection, providing an alternative to probable cause as the basis for the search, it would not be apparent to government agents that the checkpoint video would have potentially exculpatory value.

Additionally, unlike in *Zaragoza-Moreira* and *Cooper*, the Court does not have evidence before it that would allow it to infer an intent by government agents to suppress evidence with potentially exculpatory value. Here, there are no allegations of conduct by government agents that approach *Zaragoza-Moreira*'s

10

17-CR-4104-BTM

deliberate omission of references to defendant's claims of duress in reports and the probable cause statement or *Cooper*'s false statement assuring defense counsel that the equipment was being held as evidence when the agent knew the equipment was about to be shipped to a toxic waste dump. Instead, the checkpoint video appears to have been preserved for a minimum of thirty days, in accordance with Customs and Border Protection's video retention policy for the Highway 86 Checkpoint, and then overwritten based on the system's storage capacity. Absent additional allegations of misconduct by government agents, the Court does not find bad faith. *See United States v. Guerrero-Hidrogo*, 710 F. App'x 774, 775 (9th Cir. 2018) (Even if [a border patrol station's surveillance video was] potentially useful evidence . . . the Government did not act in bad faith because the Government's routine overwrite of the [surveillance] video every sixty days was not a product of official animus or of a conscious effort to suppress exculpatory evidence.")

Therefore, the Court finds that a due process violation has not been established and denies Defendant's motion to dismiss the Information.

### B. Motion for Remedial Measures

In the alternative, Defendant proposes that the Court draw an adverse inference that the video would not have supported the Government's view of any contested events at the checkpoint.

"If the government destroys evidence under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions." *Flyer*, 633 F.3d at 916. "In so doing, the court must balance the quality of the Government's conduct and the degree of prejudice to the accused. The Government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice." *Id.* (internal citation and quotations omitted).

In evaluating the quality of the government's conduct, courts "inquire whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, [and] whether it was negligent

in failing to adhere to established and reasonable standards of care for police and prosecutorial functions." *Sivilla*, 714 F.3d at 1173. Next, in evaluating prejudice to the accused, courts consider "the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; [and] the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence." *Id.* at 1173-74.

Here, the checkpoint video was lost while in the Government's custody. The video was likely overwritten around the same time as the Information was filed. The Court record at this point does not contain evidence as to the reliability of the dog. If there are serious questions as to the dog's reliability, it may have been negligent to not preserve the video. But the Court can not make that determination on the present record.

Turning to prejudice against Defendant, as the Court already laid out in its Due Process discussion, the video had potential exculpatory value and was of such a nature that Defendant would not be able to obtain comparable evidence. If Defendant intends to challenge the basis for probable cause of the search that led to the discovery of the packages of methamphetamine, absent the video, he has no substitute evidence to challenge the Government's testimony of the circumstances surrounding the search of his vehicle and his arrest. The prejudice to Defendant is significant.

Therefore, the Court denies without prejudice the Defendant's proposed remedial measure, that is, drawing an adverse inference that the video would not have supported the Government's view of any contested events at the checkpoint.

## III. CONCLUSION AND ORDER

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss and DENIES Defendant's proposed alternative remedial measure.

Further, while the Court does not find bad faith in this instance, the Court admonishes the Government for failing to preserve surveillance video of dog searches from the Highway 86 Checkpoint. These videos are particularly significant in the context of checkpoint searches, where defendants are often inside their vehicles and unaware of what is happening outside. Even when defendants have an opportunity to observe searches outside of their vehicle, they may not fully appreciate conduct that undermines the basis for a probable cause to search. Allowing the destruction of these videos, with no knowledge of their content, often deprives defendants of the best means to challenge the Government's version of the circumstances surrounding a dog search and alert, extinguishing any meaningful opportunity for defendants to mount a complete defense. Therefore, the Court puts the Government on notice that such checkpoint videos capturing the circumstances surrounding a dog search must be preserved. Failure to do so hereafter may support a future finding of bad faith. Defendant may renew his request for a remedial measure as the record is developed at a suppression hearing and at trial.

IT IS SO ORDERED.

Dated: July 2, 2018

_____
Barry Ted Moskowitz, Chief Judge
United States District Court